And we'll go to the last case for today, which is In Re Nortel. So I know it can be done. That makes sense. Is it Japanese? Okay. Good morning, Your Honors. Good morning. I'm Brian O'Connor from Wilkie, Farr and Gallagher. On behalf of the two appellants, the trustee of the Nortel Network UK Pension Plan and the board of the Pension Protection Fund, could you please tell us what the effect of the stay is on the UK regulatory procedure right now? Why stay is such an ordinary thing in bankruptcy proceedings, and we understand there are proceedings in Canada and UK and in the United States, but specifically what is the negative effect, the consequence of the stay on the procedure in the United Kingdom, dealing with the shortfall? The debtors and the committee, they would contend that there's really been no harm, no foul, because notwithstanding the fact that the Bankruptcy Court essentially ordered that my clients not participate as was their right in the UK procedure, and the procedure went forward, and the pensions regulator convinced the determinations panel that, in fact, FSD should be issued against two of the U.S. debtors, NNI and NNTELA. The fundamental problem that continues is the fact that the judge's order declares the entire process and any of the results of that process to be null and void and of no force in effect. With respect to the debtors? To the U.S. debtors. With respect to the U.S. debtors. Exactly. Not with respect to the Canadian debtors, not with respect to any of the European debtors, but with respect to the U.S. debtors. I always tell my law clerks, follow the money. Where is the money? This is in escrow right now. I mean, who's got the money? I mean, the Belltel assets have been sold, right? Yes, Your Honor. And they've been put in escrow. Yes. Excuse me. Is the escrow under the control of which entity, which judicial entity? Where is it? That raises a host of other additional issues, but the short and I think simple answer for the purposes of this appeal is that the majority, if not all, of the assets of the Nortel entities have been sold, and there's approximately $9 billion that's sitting in escrow account in New York, which is, I think, arguably under the jurisdiction of the bankruptcy court in Delaware. Okay. And then there's no money in the U.K. that comes from the sale? Well, as I said, that's a whole other issue. There have been several attempts to mediate, and there is another ongoing mediation that's about to begin in November in front of a Canadian judge who's been appointed by the two U.S. and the Canadian judges, at which the parties will attempt to agree on an allocation methodology to allocate that $9 billion of proceeds across all the debtor states in EMEA, as they call it, Europe, the Middle East, and Africa, Canada, and the United States. That would be great, but is there an allocation committee, let's call it something like that, in the U.K. proceeding? If the money is in the control of the Delaware bankruptcy court, what would the allocation committee allocate? I'm not quite sure I understand what you mean by an allocation committee in the U.K. Under U.K. law, there isn't. No, there isn't an allocation committee. Maybe I'm calling it the wrong thing. What will happen here is that the allocation, hopefully mediation, or if it can't be mediated, some number of the courts, which is another subject of dispute, will have to decide how the $9 billion will be allocated among the various states. But if that's in the control of the Delaware bankruptcy court, Well, it's not completely. Well, that's what I'm trying to find out. The parties, I don't think you, if you had all the parties here, I think Judge Smith says maybe I'm talking about the determination panel. The determination panel is a different thing. Let me maybe go back and try to explain the U.K. procedure a bit. But before I do that, I think the point I just want to make is that the allocation of the sale proceeds is a completely independent issue to this issue that we have before us today. Isn't that what people want? They want the money. Well, but the allocation is based upon the fact that the Nortel business was run, not on a legal entity basis, but across the board. So there's all sorts of arguments among the various Canadian entities, the U.S. I'm sorry, what do you mean by across? In other words, they would have a business unit, which the sales of that unit would be based upon work that was done by U.K. companies, U.S. companies, Canadian companies, and it wasn't as if the business was run on a strictly legal basis. Legal entities, yes. So in other words, when they sold all these assets for $9 billion, you have the Canadian entities claiming, well, we were the ones who invented a lot of the technology, and we should get X amount of this. You have somebody else saying, well, we were the parties who spent the most money on research and development. We should get X amount, and there's somebody else arguing that. In the end, what that allocation process will do, we'll say, for example, $2 billion winds up in the Canadian estates, $4 billion winds up in the U.S. estates, and some other billion dollars winds up in the U.K. estates. But we have jurisdiction over the Delaware Bankruptcy Court, because that's part of the Third Circuit. Yes. Okay. What does anybody else have jurisdiction over? In other words, what's within our control? Ours being the Third Circuit. Well, with respect to this appeal, the only thing that's before you today— Is the automatic stay. We understand that. We understand that. But we would like to go behind that. Okay. Ultimately, depending on how this all shakes out, whether there's a mediated settlement of the allocation dispute, if that's the case, then everyone will go home happy, and there won't be any further litigation. Nobody ever goes. Well, semi-happy. On the other hand, if there isn't a mediated resolution of the allocation issue, then I suspect, and you can ask the U.S. debtors, the U.S. debtors will likely ask the judge in the Delaware Bankruptcy Court to make some determination with respect to how much of those proceeds should be allocated to the U.S. debtors. Now, the Canadian judge might want to do— or the Canadian debtors may ask the Canadian judge to do the same thing. But they don't have the money. That's what I'm getting back to. That is true. That is in an escrow account at the moment. But the parties did agree to some form of agreement in which— and that's the subject of another dispute. If they can't reach an agreement on how to allocate, will it be permissible for them to go simply to the Delaware Bankruptcy Court? I think you'll hear the U.S. debtors claim that they could do that. I think the Canadian debtors— Well, they filed claims. The U.K. debtors filed claims in the Delaware Bankruptcy Court. Well, the U.K. debtors, we're talking about two different things here. My clients are not the U.K. debtors. My clients are the pension plan and the Pension Protection Fund, which is a U.K. statutory entity much like the PDGC. Well, there's a whole other question as to whether they are governmental entities or not and come within the exception to the automatic claim. We understand that that's before us. I'm just trying to find out the practicality. There are claims that were filed by the U.K. debtors themselves, like, for example, NNUK, which is the plan sponsor of the pension plan that's at issue today. They have filed claims in the U.S. bankruptcy, and everybody's basically filed claims in everybody's bankruptcy. And those claims are going to have to get resolved at some point in time. There's a motion actually to dismiss those claims pending now before the bankruptcy court in Delaware, which will be decided sometime in October. And as I said, there was to be a mediation of the allocation issues. One of the arguments has always been that there's a confusion between the pure allocation issues and to what extent some of these intercompany claims are essentially duplicative of the allocation issues. So the mediation has been put off until this motion to dismiss the claims of the U.K. entities are decided. This is an expedited appeal. This is an expedited appeal. And what will happen, something is supposed to happen in October, I guess, so that they can get a lien. I mean, why is this expedited? What's going to happen in the near future? Okay. Let me go back, if I can, and just explain why, to answer your first question, why I think, and this is Judge Sirica's question, why I think this is important as to the impact of the automatic stay. What the judge basically did, the bankruptcy judge, is he said, look, I am not going to allow you to participate in the U.K. regulatory procedure, which is a procedure where the pensions regulator, which is very much like the Pensions Benefit Guarantee Corporation in the United States, clearly a governmental agency. Well, that's a question, but go ahead. I don't think there's any dispute. I don't think any of the parties would dispute that. That has to proceed in front of something called the determinations panel, which, again, is part of that same agency. It's only the pensions regulator that has a claim under U.K. law to try to seek financial support from affiliates of the plan sponsor. It's only the pensions regulator. There is no statutory, there's no contractual, there's no common law right of my clients, the pension plan or the pension protection fund, to seek any type of money from affiliates. The only claim that they have under U.K. law is there's a claim for the deficiency against NNUK, which is the plan sponsor, the employer. That's the only thing they can do. So the point on this is that the pensions regulator, the regulatory authority, is the only one who can initiate and prosecute a claim before the determinations panel to require any of these affiliates of NNUK, the U.S. debtors, in this case NNI and NNCALA, to provide any financial support to the plan, which has a $3 billion funding deficit. To make up the deficiency. To make up the deficiency. Now, the importance of this is that when the bankruptcy court ordered that entire process null and void, as violative of the automatic stay, the bankruptcy court said, I don't care if that process goes forward without you and if a financial support direction is issued to any of the U.S. debtors. I'm going to treat that as null and void. The next step in that process is if the target of the financial support direction doesn't come forward, again, to the TPR, the pensions regulator, not to my clients. If he doesn't come forward and propose a plan of support that's satisfactory to the pensions regulator, the governmental agency, then the next step is the pensions regulator goes back to the determinations panel and it asks for the issuance of a contribution notice. The contribution notice is actually, if it's issued, will liquidate the amount of the financial support required to be proposed by the target. And under U.K. law, it becomes a debt, a debt owed to the plan, or if the plan is accepted into the pension protection fund, like the PBGC insurance, then it's a debt to the PPF. Now, the important point here is that when the judge in the bankruptcy court said that the whole process is null and void, you will not be able to even introduce into evidence the fact that there was an FSD issued, which is taking a contingent claim for support and fixing it, or a contribution notice which actually liquidates the amount of the claim. You can't even enter that into evidence. Instead, the bankruptcy judge said, I'm perfectly capable of putting my determinations panel hat on. Stay on the tape because we get that. I'm sorry? Stay closer to the microphone. You're being taped. The bankruptcy court judge said, I'll put on my determinations panel hat. Determinations panel, by the way, is a particularly expertized panel of individuals that's appointed by the U.K. Secretary of State. But the bankruptcy court said, I'll put my hat on, and I will let you, the trustee and the pension protection fund, who are not the parties who have the right or the ability or the burden to go before the determinations panel and to obtain issuance of an FSD or a contribution notice, and I'll let you try to prove the pensions regulator case. I'll put my determinations panel hat on, and I'll decide if there should be any support paid by the U.S. debtors, and if so, in what amount. And our argument is always that. So that rule then that you are suggesting the bankruptcy court has arrogated to himself is a substitute for the noncompliance contribution notice? It's a substitute for the entire regulatory process because what the bankruptcy court judge said- Ultimately leading, though, to the noncompliance contribution. Yes. The key is if this process worked the way we think it should have- Paid by the- I'm sorry. If it worked the way we think it should have, then the amount of any claim that the plan and the trustee would have and PPF against the U.S. debtors would have been fixed and liquidated pursuant to the U.K. regulatory procedure in front of the determinations panel. Now, we've always acknowledged that under the exception to the automatic stay, we couldn't go and try to enforce or try to execute any type of a monetary judgment, that we submitted proofs of claim to the bankruptcy court, which at the time were contingent and unliquidated because at the time that they were submitted, the regulatory process had not been completed yet, the FSDs had not been issued, and to this day no contribution notices have been issued. But the point of the process was to fix and liquidate the claim, take that claim then to the bankruptcy court in the form of the proof of claim, and we said the bankruptcy court could then decide how that claim should be treated for purposes in the bankruptcy. Admittedly, we thought that if the automatic stay did not prohibit that process, that it was accepted by Section 362b-4, then when we came back with a, for example, a contribution notice, then that the court ought to defer to that unless under principles of comedy, there was some reason that the debtors could argue to the judge that he should not do that. Either the notion of that type of relief was abhorrent to the United States, that it was somehow inconsistent with our law, which I could explain, I don't think they could possibly do, or something like that. But if they couldn't do that, the court should respect that, defer to it, rather than take it on its own to say that's completely null and void, you can't even introduce evidence of that. Instead, I'm going to put on my determinations panel hat. I'm going to take the place of an expertized foreign agency, and I'm going to make you prove a case that you didn't have the right to or the burden to prove in the U.K. Has the district, I'm sorry, has the bankruptcy court explicitly said you may not use this as evidence? Yes, yes. Well, the transcript of the hearing was quite clear that the U.S. debtors wanted to make sure that as part of this process, nothing that occurred in the U.K. revenue procedure would be introducible as evidence of any type of liability or the amount of that liability in the U.S. case. Well, what's clearer is that the U.S. debtors, or creditors, I guess, didn't want to come in behind the U.K. Well, that's a very good point because, again, if you look at all the cases, including all the court's cases in the Third Circuit, whether it's Pantera, whether it's Mystic, whether it's Brock, whether it's Nicolette, most of those cases talk about, when you say a pecuniary interest, they're talking about a pecuniary interest of the government, and what the government can't do is it can't elevate its interest or put that ahead of someone else. That's not happening here. That claim, we filed a proof of claim that's dependent upon the FSD and a CN being issued in the regulatory procedure. But it's a general unsecured claim. It's not a secured claim. It's not a priority claim. There's no elevation of that claim above the claims of any other creditors in the estate. This is not like the Missouri case where Missouri, the debtor was a grain operator. They had grain in some warehouses in Missouri, and Missouri had its own Department of Agriculture who decided to try to assert a liquidation proceeding over the debtor's grain. And the court said, you can't do that. That grain is property of the estate. You're essentially taking that property away from the estate. That's violative of the automatic stay. That's not happening here. Nothing's happening to the $9 billion that's sitting in the escrow accounts in New York. All that's happening is that claim will be fixed and liquidated under U.K. law, which governs it, and then the claim would be brought to the Bankruptcy Court without any elevation of preference in any way. So it's just a proof of claim. Just a proof of claim. Why does U.K. law govern? The U.K. law governs. Has it distinguished from U.S. law? Well, the U.K. law governs because this is a U.K. pension plan. Under the U.K. law, there's a deficiency in the pension plan. And unlike U.S. law, which this is an important point, I think, if we were in the United States, and what I was going to argue, but obviously we spent a lot of time on questions which are good questions, is that let's think for a moment, compare what happens in the U.S. in the ERISA context with the PBGC and the Department of Labor and how that is affected by the automatic stay when there's a terminated plan and there's a deficiency, and let's see how that compares to the U.K. system and whether there's any meaningful reason to distinguish between how the automatic stay applies. If we were in the United States and there's a deficiency in the plan, the PBGC can bring an action in the district court, even though the debtor's in bankruptcy, without a violation of the automatic stay, and it can obtain an order involuntarily terminating the plan. No violation of the automatic stay. What happens on that? When that order is issued, termination liability arises. It arises for all the unfunded benefits in the plan and for any due and unpaid minimum contributions. Importantly, it arises not only for the plan sponsor, the employer in this case and in U.K., but automatically under United States law, all of the members within the controlled group of that plan sponsor are jointly and severally liable for the amount of that unfunded liability. Who determines what the amount of that unfunded liability is? The PBGC does. Pursuant to its internal regulations where it tries to calculate what would it cost to go out and in the private market buy annuities that would cover all the benefits that would be due to those members in the future. So all of that happens without any impact of the automatic stay. So Department of Labor. The Secretary of Labor has the power, and there's several cases we cited in the briefs on this, where if it can go into district court, it can sue planned fiduciaries when the fiduciaries have failed to make contributions to the plan, have purchased securities which they shouldn't have from funds of the plan, have taken loans from the plan that they shouldn't have, and it can not only get injunctive relief, but it can get orders of restitution. Where does the money go? The money doesn't go to the Department of Labor. The money goes to the plan. All of those things under U.S. law can be done without any violation of the automatic stay because they all have been held to have been encompassed within the regulatory power exception. Why? Because Congress has made it clear that there was a public purpose in trying to protect the pension benefits of all the workers in the United States. Similarly, in the U.K., in the Pension Act of 2004, Parliament became very concerned that there was a total lack of confidence in the U.K. pension system, and it enacted the Pension Act of 2004 to try to restore that confidence. It's that act that created the pensions regulator, which for the first time gave the agency the power to do what automatically happens in the U.S., to go after affiliates of the plan sponsor of a deficient plan, and unlike the U.S. where it's automatic, there is a whole process before the determinations panel where the pensions regulator has to prove its case, has to establish that there is good reason to hold some of the affiliates of this plan sponsor responsible for the deficiency in the plan. That can be appealed to the Court of Appeals in court. The whole due process that doesn't exist in the United States because there's automatic joint and several liability of control group members upon the involuntary termination of a plan with a deficiency. The other thing that the Pensions Act of 2004 did was it created the Pensions Protection Fund, and the legislative history of that act indicates that it was expressly modeled after the Pension Benefit Guarantee Corporation. It's the insurance part. But essentially what the U.K. did is it broke the PBGC into really three parts. It said there's the pensions regulator, you're the prosecutorial arm of the agency, you go investigate a plan and then decide whether to commence a proceeding in front of the adjudicatory body, the determinations panel, to decide whether or not it's appropriate under the circumstances to make some of the affiliates of the sponsor responsible for the deficiency. And then the third piece of this is the Pension Protection Fund. It's the insurance arm which is funded just like the PBGC with levies on other covered plans and on with any amounts that are recovered on termination liability or when the assets are taken into the plan. And it was that act of 2004 in which Parliament, just like Congress, expressed the public purpose of trying to restore confidence in the U.K. pension plans and to arm a regulatory body with the powers to try to ensure that employers put the amount of money that they should into the plan so that you don't wind up with unfunded benefits and also what they call the moral hazard of having created an insurance arm, the PPF, that employers didn't just shunt their responsibilities off to the PPF. So I submit, Your Honor, that there is no principle difference or reason to treat the U.K. regulatory process any differently than what happens in the United States with the PBGC and the Department of Labor. Why should we reverse the bankruptcy court, I guess it comes by the district court, automatic thing? Why should you reverse it? Well, aren't you asking us? We are asking you to reverse it. And then why? Why? Because for a number of reasons. Number one, both the bankruptcy court and the district court, I think, committed fundamental errors of statutory construction. Your decisions in the Third Circuit are quite clear, particularly Pinterra, that because Congress used the words police power and regulatory power, very broad words, that the regulatory exception in Section 362b-4 should be broadly construed. But we have to treat a stay broadly as well. You do. Isn't there some tension between the very concept of a stay and its breadth and the language of Pinterra that you're citing? Well, Your Honor, I think Congress itself recognized that although the stay is very, very broad, there are exceptions to it. Clearly there are exceptions to it, and one of the exceptions is the regulatory police power exception. And what the court said in Pinterra, which I think is absolutely correct, is that what you're really dealing with is issues of preemption and supremacy. Is the language that you rely upon in Pinterra part of the holding, or can it fairly be construed as dicta? I don't think it's dicta because the court had to construe how do you interpret that exception. Do you give it a narrow meaning? Do you give it a broad meaning? And I think the important point was what the court was focusing on is you're dealing with federal-state relations, and obviously Congress has the power to preempt an area of the law so that a state can't regulate it, but as the court recognized in Pinterra, you know, if Congress chose to decide that Pennsylvania can no longer regulate the environment, it could do that, but that's not likely to be inferred, and in fact the default is that Congress doesn't intend to displace state law. And I think the important point for this case is this is an extremely important case because this is the only court of appeals that will have had the opportunity to address the regulatory power exception in the context of a foreign proceeding. There are only two cases that have done that. I've been involved in both of them, the sea containers case in which Judge Kerry went the other way, and in this case in which Judge Gross said it violated the state. PPR is the relevant governmental unit. Yes. And it's not a party to the litigation. It's not a party. That's true. If the determinations board goes ahead and makes a decision, and we get to the end of the proceeding in the U.K. and without the participation of the affiliates here in the United States, why is that a bad thing? Well, the bad thing about it is it's null and void according to the bankruptcy judge's order. As applies to... As to the U.S. debtors. All right, but we have an automatic stay here. I mean, are you saying that this would never be revisited at that time? No, what the judge has made quite clear what he would intend to do is honor a proof of claim. He will try that case. He will sit at the determinations panel. He will ask the pension plan and the pension protection fund to take on the case that the regulatory agency in the U.K. has the obligation to take, and they will have to prove that case before him, and he'll decide whether or not to allow any financial support, and if so, what the amount is. Roberto, is the mic on? Is it working? I want to be sure we're taping. Go ahead. I'm sorry. And to me, Your Honor, that's the problem. I acknowledge the fact that the process, even though we had a statutory right as directly affected parties to participate, we were denied that right because we were enjoined on pain of contempt of court to participate, and we obviously didn't do that, but that's a continuing problem for us because even with the FSDs that have been issued, and even if there is a contribution notice that follows, the bankruptcy court is not going to allow that into evidence. He's going to start from scratch. He's going to ignore the U.K. procedure. He's going to decide as the determinations panel whether or not we, who had no claim under U.K. law, had no burden under U.K. law, whether we have essentially proven the case of the TPR who's not even a party in the bankruptcy. And there's no reason, our argument has always been, to do this. Number one, if you look at Penn-Tarrant, we talked a little bit about the importance of the federal-state relations. When then you turn to the fact that what's happening here? This is a U.S. court which is saying that the automatic stay interferes with and declares null and void a foreign sovereign's regulatory process. Now, number one, why is that necessary? When all this process does is to fix and liquidate the claim, not enforce any monetary judgment. The claim comes back under our proof of claim. It's now become a fixed rather than a contingent claim and a liquidated claim. It's submitted to the bankruptcy court. He decides how it's treated under the debtor's plan. He decides whether he should defer to it under principles of comedy. If he thinks he shouldn't, then he can do what he wants. But it shouldn't be ignored as if it just didn't exist. Excuse me. We have heard your position right now. I'd like to hear the other side, and you'll have rebuttal. We may have more questions for you after we hear their side. I suspect you will. Okay. May it please the Court. Good afternoon. Debra Buell, Clary Gottlieb, Stephen Hamilton, LLP on behalf of the Debtor's Appeals. And it is a pleasure to be here today before this Court and discuss these very interesting issues. But I do want to start by saying that it is our position that the issue before the Court on this appeal is a rather narrow one. Yes. Which deals only with whether the stay was properly applied in this situation. And whether there was an exception, whether they come within the exception for the police power. Yes, Your Honor. For the automatic stay. Correct, Your Honor. I'd like, if I may. But you understand why we want to know more. Absolutely. And I'd like, if I may, to try to address your questions on that, to give some context and then deal with the B4 stay issues in particular. The status right now is that there is approximately the number 9 billion was used. I thought it was closer to 8. Close to a billion dollars. Not zero. Between friends in a escrow, which is located physically in the United States, in a bank in the United States, but which is subject to the jurisdiction of both the Delaware Bankruptcy Court and the Canadian Court, which is handling the Canadian parents CCAA proceeding.  And so, in the last couple of years, what we had in January of 2009 was kind of a filing in three separate jurisdictions of different parts of the Nortel Global Enterprise. We had the U.S. filings in Delaware under Chapter 11. We had parent filings and other affiliates in Canada under the CCAA. We had the filing of NNUK, which is the sponsor of the NNUK pension plan, together with various European and African affiliates, filed for insolvency administration in the United Kingdom. And those all happened in January of 2009. Over the course of the next 18 months, actually just being completed over the course of this summer, those three jurisdictions cooperated in the sale of assets under an agreement that the proceeds would be placed in this account in the United States, but importantly, subject to the jurisdiction of the Canadian Court as well as the U.S. Court. There was not a demand made by the entities in the U.K. administration for concurrent jurisdiction by the U.K. Court. As Council has advised the Court, of course there's been an effort to mediate a resolution of the division of those proceeds among the three separate jurisdictions. Where does that mediation stand? Who's mediating it? Right now, Your Honor, there has been the appointment of a Canadian justice, Justice Winkler, who has taken over the mediation, and we have not yet met with the justice. There is a motion pending before the bankruptcy court in Delaware with respect to certain claims that have been asserted by NNUK, and the schedule contemplates that Judge Gross will hear those motions and decide them, and then the mediation will proceed. Is there any point? I'm sorry to interrupt you, but this is interesting. Is there any reason why we should hold what's before us pending the determination of Justice Winkler, which might be a year or two, but, you know, they're young. They have a long life. I mean, do we have to act now, or should it wait and see if the parties can mediate, which is the end result of all of this, is who gets what. Where's the money going? Do we have to act now? Your Honor, we certainly, the debtors certainly do not believe that this was an appeal that required expedited treatment. Obviously, counsel for the trustees felt differently. That's because the SINs are going to come out in October? Effective October 1, the time period for the U.S. debtors and the Canadian debtors to respond to this financial support directive does expire as a matter of the U.K. process. Now, as I think the paper has pointed out, Canada has, the Canadian debtors made a motion to enforce their stay with respect to this process. In fact, interestingly, TPR did appear and participate in the Canadian proceeding, even though not in this one. We gave them a copy of the same motion, and the response from them, which is actually in our record at A392, was, we've read your motion and we don't think it affects us. And that was the basis in the record before the judge. But what is your position or your client's position with respect to the question I asked, which is, can we just hold everything until there's some effort, hopefully effective, of the mediator coming out with his result, which may take a long time? You most certainly could, Your Honor, because it is our expectation that the process in the U.K. will not proceed beyond the October 1 date with respect to a SIN process where there has been no determination of what the assets of the plan sponsor. I want to be clear. It is an entity, NNUK, which is actually responsible today for these pension fundings. The pension fundings of the U.K.? Of the NNUK, that's correct, Your Honor. Of course there is a pension plan that the U.S. debtors have responsibility for, and the PBGC has filed that claim with respect to the U.S. debtors in our case. And that is the U.S. debtors' responsibility, obviously, and will be addressed. And I just want to note that the PBGC has not filed a claim with respect to the Canadian parent, notwithstanding the ability to do so under control group liability. In fact, the PBGC's policy, as I understand it as a bankruptcy practitioner, I don't speak for the PBGC, of course, but nonetheless, the PBGC is very careful in instances where affiliates are also in an insolvency proceeding to pursue that type of claim. So I understand your position. And tell me if I'm wrong, that as far as your clients are concerned, we don't really have to act at all. We can wait until the Canadian mediator, picked by everybody, Justice Winkler, acts. Yes, Your Honor. I also think that it is absolutely the procedural status of this issue, that a lot of what we have been debating in the papers and what we've heard from counsel so far goes to the question of how the claim should be determined. That is an issue which is properly debated on a motion to lift the stay for cause under 362D. And as this Court may appreciate, it is typically standard operating procedure that when a motion to enforce the stay is made, the respondent asserts in good faith there are bases to say the stay doesn't apply to me, but in the alternative, if it does, here's my cause for why this stay should not apply in this instance. And that motion, for reasons which are known only to appellants, has never been made in this case. The parties have argued about how the claim should be determined because in a very, very unusual and unprecedented fashion, appellants here are saying to lower courts and now this Court, that we, who are parties asserting private claims, can rely on 362B4, the exception which permits government units to enforce police and regulatory power. We, private parties, can rely on that exemption, not just to participate in this UK proceeding, but to fix and liquidate the very proofs of claim which they had previously filed in the bankruptcy court and submitted to the jurisdiction of the bankruptcy court. Those two factors, the fact that we have private parties asserting private claims, saying we can take advantage of B4, and that we have uncontested evidence in the record, and also I think counsel has been very clear about his view that the purpose of the UK proceeding is in fact to fix and liquidate the proofs of claim which the appellants had previously submitted to the bankruptcy court. You mentioned these are private parties. At some point I'll ask you to discuss that, whether they are truly private parties or whether it's a public agency that's involved. So there are the three parties. Well, actually, we have the TPR, which is not a party, which chose not to participate. It is a government entity. For purposes of this appeal, Your Honor, we do not debate that. I think that if we were to see this again in another context, having done more work on this, I would reserve the right to pursue that issue. But certainly on this record and what's been presented to the bankruptcy court and the district court, we have not challenged that. Okay, that's the pension regulator. That is the pension regulator. Okay, get back to Justice Ricketts. The trustees, we think there is no dispute, and it's my understanding that there has been no contention that counsel argues that the trustees are any kind of governmental unit. The PPF, parties have debated that. And certainly to the extent that there is a comparison between the PPF and the PBGC, there are some glaring differences. The PPF was established by the U.K. government, though, was it not? That's correct, by the statute, absolutely, Your Honor. And it is privately funded. But the PPF, very differently than the PBGC, does not have its own right to assert. What the PPF is doing today is it's standing next to the trustee and together with the trustee is asserting the private rights of the trustee. The PPF, just like the pension regulator, does not have a governmental claim of its own to assert on behalf of the public. TPR has the right, interestingly, to start a process. They do start this FSD process, and they do present their point of view to the determinations panel. But the TPR does not have the ability to enforce an FSD as a matter of U.K. law, and this is undisputed. As a matter of U.K. law, an FSD really has no legal binding effect. It's a please do this kind of thing. With respect to the contribution notice, that has to be enforced through the trustee's right. It is a payment owed to the trustees, not to PPF or to TPR. And in fact, one of the interesting things about this U.K. Pension Act, which I think demonstrates our broader point that the Act is focused on the expansion of private rights as opposed to the more public interest which the PDGC asserts of its own right, is that if the PPF were to take over responsibility for the U.K. plan today, which it has not yet done, it's in this period of assessment. If the PPF were to do so, then the TPR could not issue a contribution notice. And that is section 47.5 of the Pension Act, which we submit underscores our point that the framework, the statutory framework of the U.K. Pension Act is not about enforcing governmental public claims in the way that the PDGC has the claim that it can enforce directly against the plan sponsor or against control group. The PDGC has that right. Here, the PPF goes through the trustee's right, as does the TPR. Once they decide whether the rights of the affiliate in the U.K. should be expanded or not in this process of theirs. The only other thing I'll say about the PDGC is that it is absolutely true that the PDGC is not subject to the stay when they seek to involuntarily terminate a plan. But that is in the ERISA statute itself. I mean, before the bankruptcy code was enacted, in 1974, when Congress enacted ERISA, there was a specific provision added, 1342E, which says that with respect to the filing, or with respect to involuntarily terminating a pension plan, the PDGC is not affected by bankruptcy filing. So there's very clear and specific congressional intent with respect to that. And similarly, when you get to the police power exception, where the PDGC is acting as a creditor, and it has an automatic lien, there the police power exception does not accept that lien from the stay. That stay is the lien is stayed by that. Your Honors, I've given probably more detail than you wanted. No, we wanted it all. I guess I'd like to wrap up and allow my co-counsel an opportunity to address the panel with just a couple of points. We do think that the stay issue is a narrow one. We do think that it is absolutely unprecedented to imagine that B-4 can be construed to permit a party that is asserting private rights. Put aside whether the PPF in some instances acts as a governmental instrumentality. In this case, they are certainly asserting the trustee rights. So to permit them to rely on the police power exception to say, okay, we can fix and liquidate our claims, which we previously submitted to bankruptcy court jurisdiction, and we can do so in a country where the Chapter 11 debtor has no offices, no assets, no employees, and we can do so in a proceeding which has such secrecy aspects. This is Section 82 of the U.K. Pension Act. It has such secrecy limitations that the debtors have not been able to share, even with the representatives of the official committee of unsecured creditors, the details of the warning notice that were received by it. The idea that this $3 billion claim that they are asserting in our bankruptcy, not based on a pension plan sponsored by the U.S., but by a pension plan sponsored by an affiliate, which certainly is our contention, and I don't think that it's really disputed, that the U.S. had nothing to do with the U.K. pension plan. We never guaranteed it. We weren't involved in making decisions about it. I really don't think there's any factual dispute about that. So the idea that this claim, which of course is quite significant, $3 billion, would be fixed and liquidated in this proceeding where none of our major parties and interests can even get the information, much less participate. We think that is an extraordinary ruling with respect to the automatic stay. We may get to that when we get to the claims objection, if we have to get to the claim objection because we cannot resolve it. We may have some very interesting further issues and be back to present them again. But for today, the issue of the stay, I think, is really quite narrow. We understand that. Let's assume that it gets to the point where the automatic stay is in place and the bankruptcy judge in Delaware then will have to decide whether there's a deficiency and how much there is here. How would he proceed on this? Your Honor, I'm glad you asked me that because I did want to address the issue of the stay. The stay order, which is in the record at A30, does not preclude appellants from seeking to offer the FSD as evidence. What it precludes is that the appellants, who we think are properly stayed from participating and presenting a case against the debtors on this claim, they cannot sit back and bring in the results from the U.K. process and say, this is legally dispositive. This is the number, $2.9 billion. This is the number. There is some colloquy at the end of the hearing transcript where the U.S. debtors are trying to come up with a proposed stipulation to resolve this issue with the trustees, trying to get them comfortable. And in that discussion, it's quite clear that the debtors were taking the position that, you know, this is what we would like to argue. But there was never any suggestion that that was what was covered by this order because the trustees weren't interested or weren't able, didn't feel they were procedurally able to resolve it. So on that issue, I would think that what would happen would be that the appellants would seek to offer it, and they might even, you know, move to lift the stay or to modify the stay or even annul the stay, right, all of which are options under 362D. And so your position is that nothing is lost by not participating in the U.K. regulatory procedure. I think that the record to date is that the TPR can be relied on to seek to fulfill what it perceives as its function. But not the benefit but we would like to think that there's opportunity for the TPR to assist on the other end in deciding whether this should occur or not, not necessarily to the ministers and not necessarily to the commission. So what we would need to hang onto is, you know, if a proceeding proceeds past October, then there would be a determination of what the claims that have been The process would be that the TPR, after October 1, could proceed with a CN process. We don't think that that is likely because, of course, one of the things that TPR is supposed to consider is the relative assets of the sponsor and the various affiliates. And, of course, we do think it's manifestly apparent that that cannot be done until the allocation process has been completed. But if there is a CN issued, right, then the question will come to when do we determine the UK pension trustees' claim in the bankruptcy proceeding? In the U.S. bankruptcy? In the U.S., yes, Your Honor, in the U.S. bankruptcy proceeding. And I assume that the UK participants would say that can't or shouldn't be questioned in the Delaware proceeding. I mean, it should just be accepted at face value. Yes. And the appellant indicated that he thought, counsel, he thought that the bankruptcy court in Delaware was going to require it to be re-proven. Is that what your understanding of what he said? He said that the Delaware bankruptcy court wouldn't give any credence to the amount that came in. Is that what you understood? I understand that the bankruptcy court is not going to consider itself legally bound to accept the number. That's right. And if the bankruptcy court doesn't do that, then you require a re-determination of what has been already determined in the UK proceeding. I think, Your Honor, that there will be a process by which the U.S. debtor makes our case as to what the number should be as well as raising other defenses to this claim. But that wouldn't be efficient. Your Honor, it may not be efficient, but for any proof of claim, and certainly a proof of claim of the size of this one, there are other parties and interests in our Chapter 11 proceeding who are entitled to participate. And I think that... And his answer would be, well, it's only the automatic stay that's stopping them from participating. That they could challenge the... As I understand, they could challenge the amount if they were permitted to participate in the proceeding in the UK. Your Honor, with respect to parties and interests, and here I'm talking about, for example, the creditors' committee, the CBGC, the bonds, those are the parties. They are absolutely not able to participate in the UK proceeding. Well, they can't because of the automatic stay. Could they if there were no automatic stay? Absolutely not, Your Honor. Why? Because TPR decides who the interested parties are. And they have a very narrow view of that. The trustees are an interested party. PPF is an interested party. And the targets are an interested party. So, I mean, we have not even been able to share with the creditors' committee the underlying materials, much less have them participate if the debtors were so inclined to do so. And that's just a matter of UK law? Yes, Your Honor. I see. So, let me... Can I summarize that to make sure I'm right? Yes. So that the UK proceeding is closed to the U.S. debtors? It is under Section 96 of the UK Pension Act. The regulator decides who an interested party is for purposes of its proceeding. Now, could they ask to be considered an interested party? Your Honor, that I do not know. My understanding is that the TPR is highly restrictive. And, in part, that ties into this confidentiality or secrecy provision that I referred to. That is Section 82 of the UK Pension Act, which basically puts one under criminal penalties for showing materials that TPR had received and used that are not publicly available. So that the U.S. debtors would have a constitutional claim that the order that emerged hadn't given them the opportunity to participate? I think it certainly is the case that the entities to which we have a fiduciary duty and who are entitled to participate in the resolution, the liquidation, allowance process for claims in our case would not be able to participate in this proceeding. Okay. Thank you. Thank you. Do you have any questions of her? Tony, do you have any questions of her? Okay. Thank you. You have another? I hope this is Ladies' Day. From all three sides. Do you have a minute? May I please record? I'm Patricia Millett. I represent the Official Committee of Unsecured Creditors of Nortel Networks in this case. I'm not from CERI. I'm not from CERI, either. I'm from Aiken Gump. What's more relevant is that I represent the Official Committee here, which, as was just explained, is completely walled out of this U.K. process. Now, if I could just get to a couple of questions or comments that have been raised, and obviously answer anything you have that you want to ask me. First of all, with respect to should this court stay at hand pending this mediation, the Official Committee joins the debtors in saying that's the appropriate course and it's sensible. This is a very complicated international bankruptcy process. We're aware of that. It's even worse when I look from here. Have you asked for that? I didn't see that in the papers. And I did read the briefs. Have you asked in your briefs that we – that everything – well, that the status quo continue and that we not – well, you have asked. That's the stay. The motion before us is really a motion to enforce the stay. It didn't come from a motion to lift the stay. Which is important, yes. Yes, okay. But with – the short answer is no. Our papers don't specifically ask this court to stay at hand. That would have been a bit awkward with this court having granted expedition to then have said that. And with the stay, automatic stay in place, of course, our interests have been protected through this process. But Your Honor has raised the issue, and I simply wanted to share with you the Official Committee's view on that. And as Ms. Buell explained, it makes sense because the U.K. process, of course, has to determine first and foremost what the assets are of the Nortel Networks U.K., which that mediation process is designed to address. Everything depends at some level upon that before we can decide how much other folks have to chip in. That's the one that's before the Canadian Justice – The mediation, yes, exactly. The mediation process for this fall. Very quickly, because I don't want to distract you on anything, it's 10-terra. It is dicta. Page 274, excuse me, of that decision says that in that case, the relief thought was – which was to make someone clean up contaminated ground from mining, felt squarely within the exception. No more obvious exercise of the police power was this court's word. So it wasn't testing the outer limits. Who ends – but the – if there's a shortfall, then – I'm getting the initials, the acronyms all mixed up. There are a lot. CPF ends up with – it is the state agency that takes the money and then tries to recoup from the other companies that are part of the entire group. It's a statutorily created entity that will – if, through this whole process, it turns out that the fund runs out of sufficient money to meet the pool of funding required by the PPF, the fund itself, which I'm being technical because that's very different than the buyout value that the PPR is enforcing. So the question – that $3 billion is what it would cost to buy annuities to pay all these beneficiaries in the U.K. And, of course, annuities are more than actual benefits owed because they have risk insurance and things like that in there. There's about – I think about $2.4 billion of the last year still in the U.K. plan. And not a payment has been missed. There's no allegation. There's no allegation of wrongdoing or violations in any sense. It is simply that the TPR's job is to make a prognostication based on this annuity. So it's like a requirement to have some extra in there, and that's where that number comes from. But the PPF comes in if it turns out the benefits won't get paid at the level required by the PPF, which is, in some instances, a little bit less than 100 percent. And then they come in and pay it out. And what is important to keep in mind with respect to evaluating the nature of this TPR process is that the PPF does not itself then go and get a contribution notice from somebody. It doesn't do it. That process stops. If the PPF were to come in today, the process would stop. So it is, as of now, it's very much sort of on the sidelines. It's very, very interested on the sidelines, but it's on the sidelines waiting to see if it's going to have to come in. While there, it can step into the shoes of the trustee and exercise interest on behalf of the trustee. But with respect to the police power section, which is what's ultimately at issue here, it does not enforce police power on behalf of itself if it comes in now. Its involvement now is to enforce the private right of the trustee. And I think that with – I understand there's a lot of information going around here, but the question really is quite narrow. And it's important to stand back and look at what is going on here. The pellants are asking you to create a categorical exception to the automatic stay. Not a case-by-case listing. A categorical exception construing the language of the police power exception to apply to a private creditor that has submitted a claim in bankruptcy, but wants to take that claim and determine the value of that claim in a forum other than the bankruptcy court. The Supreme Court in the Gardner case said there's no more basic aspect of the bankruptcy process than the power of the bankruptcy court to determine the value of disputed claims. We're told that it's experts in the U.K. They are experts. And this is very respectful to the U.K. process, but their expertise is in deciding what U.K. pensioners are owed. The bankruptcy court is the expert here, unless you fall within the language of the police power. And the bankruptcy court will have to decide what all creditors equally treated within their class are owed, and allowing one creditor to pick up and move overseas and take the debtors with it. Because if they participate, or even if they don't participate, if they are able to give legally operative effect to that foreign determination in the bankruptcy court, the debtor has no other choice but then to fight. What the stay did here is what the stays always do, and it put up walls around the bankruptcy process that protect the debtor against having to litigate bankruptcy issues in another forum. It protects the creditors and ensures equal treatment. The reference to the Pension Benefit Guarantee Corporation is quite interesting. That's a member of our committee, the Pension Benefit Guarantee Corporation. And guess what? It does make its own assessments. It has more than a half billion dollar claim, $550 billion claim in this case. It does not get to pack up and go determine the value of that claim if it's disputed in another forum. That's done in the bankruptcy court, under bankruptcy court standards, and allowing one to go and do it somewhere else. So that U.K. pensioners, with the U.K. vantage point of that process, then have a legally operative determination of the value brought back into this bankruptcy process, does what the stay forbids. It prevents equal treatment. The critical thing here is that the argument, and the bankruptcy order is clear, and the position was clear. The argument that the appellants made was that they wanted it to have, they didn't want to participate just for the sake of participation. They want that judgment, and even if they don't participate, they want that, not judgment, but a decision that comes out of this U.K. process, if it ever does, to have preclusive effect. A696, the appendix, A655, 755 to 756. In fact, on 695, they stand there and say, unless we get this U.K. process behind us, our claim is, quote, thin. Follow the money, you said, Judge Sloverter. They don't want it to be thin, and the way to do that is to have someone with a U.K. vantage point, which is what U.K. entities should do, determine the value instead of a bankruptcy court doing it with an equal treatment. But you're assuming, I think, that the U.K. process would not treat fairly or equally the pensioners, or those with pensions in the U.S., to those with pensions in the U.K. Is that right? I mean, when you keep saying from a U.K. advantage. The statutory obligation of the TPR is to protect the beneficiaries in the U.K. But if beneficiaries in the U.S. come before it or then, whatever it is, you're assuming that the obligation to protect the U.K. pensioners will take precedence over the U.S. creditors or pensioners. I am making that assumption because that's the job of the TPR. It has a job to take care of the U.K. pensioners. That's its job. That's what the scheme was set up for. Now, part of this is begging the very question, which has yet to be resolved, about what are the U.K. laws.